Continental Illinois National Bank and Trust Company of Chicago, as Trustee Under the Will of Silas J. Llewellyn, Deceased, Plaintiff-Appellee, v. Mary Isabelle Llewellyn, et al., Defendants-Appellees, Elizabeth Llewellyn Warner, et al., Defendants-Appellants, Continental Illinois National Bank of Chicago and Everett Stone, as Executors Under the Will of Gertrude L. Stone, Deceased, Defendants-Appellants, Fidelity-Philadelphia Trust Company, as Trustee, etc., Richard Kadish, et al., Elizabeth P. Stoddard, et al., Ester M. Sobel, etc., et al., William Goldberg, et al., Leonard P. Levy, et al., Allen Kandell, et al., John K. Jacobs, et al., Martin Rosenthal, William Goldberg, Benjamin Byer, et al., and Samuel Liss, Defendants-Appellants.

Gen. No. 49,761.

First District, Second Division.

January 25, 1966.

Rehearing denied February 15, 1966.

Wilson & McIlvaine, of Chicago (William B. McIlvaine and Clarence E. Fox, of counsel), and McDermott, Will & Emery, of Chicago (Hamilton Smith and Frank J. Uvena, of counsel), for Elizabeth Llewellyn Warner, et al., defendants-appellants. David H. Armstrong, of Aurora, for Continental Illinois National Bank and Trust Company of Chicago and Everett Stone, as Executors, defendants-appellants. Sidley, Austin, Burgess & Smith, Thomas H. Fisher and Norman Crawford, of Chicago (Henry A. Preston and Alice M. Bright, of counsel), for Fidelity-Philadelphia Trust Company, as Trustee, etc., et al., defendants-appellants.

Eckhart, McSwain, Hassell & Husum, of Chicago (William A. McSwain and M. A. Palumbo, of counsel), for Mary Isabelle Llewellyn, et al., defendants-appellees.

Harry J. Myerson, of Chicago, for William Mooney Valentine, also known as Charles Callison, a Minor, defendant-appellee. Jerold S. Solovy and Donald R. Harris, of Chicago (Raymond, Mayer, Jenner & Block, of counsel), for Continental Illinois National Bank and Trust Company of Chicago, as Trustee, plaintiff-appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

This complaint was filed by the Trustee under the Last Will and Testament of Silas J. Llewellyn, for the construction of the Will and for the determination of questions stated in the Trustee's original complaint and the amended and supplemental complaint.

Silas J. Llewellyn died in 1925, in Chicago, at nearly 65 years of age. He was survived by his wife, Mary E. Llewellyn, and by his three children, Paul P. Llewellyn, born September 18, 1886, Gertrude Llewellyn Stone, born July 15, 1888, and Elizabeth Llewellyn Warner, born April 20, 1899. The widow of Silas J. Llewellyn died on March 8, 1933.

Paul P. Llewellyn died January 10, 1956, survived by his only child, Mary Isabelle Llewellyn, who was born March 6, 1917. Mary Isabelle was the offspring of Paul's first marriage, to Mary Catherine Elphicke, from whom he was divorced in 1924. Paul subsequently entered three other marriages, the first two of which ended in divorce in 1937 and 1944. No children were born to Paul of any of these three subsequent marriages.

Mary Isabelle Llewellyn was married to Emil Frank in 1936 and was divorced from Frank the following year. She married Ross H. Callison in 1937 and was divorced from Callison in 1942. A child was born to Mary Isabelle in 1951, the child being called Charles Callison. Charles Callison was placed for adoption, was legally adopted under the laws of the State of Maryland, and is now known

179

as William M. Valentine. A guardian ad litem has been appointed to represent any interest which Charles Callison may have in the Estate of Silas J. Llewellyn.

Gertrude Llewellyn Stone died April 14, 1956, survived by her husband Howard R. Stone who has since died. No children were born to Gertrude Stone during her lifetime.

Elizabeth Llewellyn Warner is presently alive and has two children, Barbara Warner Fentress, born in 1921 and Silas Warner born in 1924. Both Barbara Fentress and Silas Warner are married and have children.

At the time Silas J. Llewellyn died in 1925, he left a substantial Estate comprised of real and personal property, which he disposed of by the Last Will and Testament here in question. The dispositive provisions of the Will, executed in 1923 and admitted to probate in the Probate Court of Cook County on September 11, 1925, are as follows:

"Second: . . .

"(b) My Trustees shall pay one-third of the entire net income of said Trust Estate to my wife, Mary E. Llewellyn, during her lifetime, and shall pay during said period the remaining two-thirds of the net income of said Trust Estate in equal shares to my children, Paul P. Llewellyn, Elizabeth Llewellyn Warner and Gertrude Llewellyn Stone, the children of a deceased child to have the parent's share per stirpes. Such income shall be paid to my wife and children, as above provided, in either quarter-annual or monthly installments as they shall respectively determine.

"(c) Upon the death of my wife, Mary E. Llewellyn, my Trustees shall pay the entire net income from the Trust Estate to my children, Paul P. Llewellyn, Elizabeth Llewellyn Warner and Gertrude Llewellyn Stone, in equal shares, the children of a deceased

180

child to have the parent's share per stirpes. In the event that any of my said children shall die prior to my decease, or thereafter while a portion of the Trust Estate is held for him or her, without leaving issue surviving, then the portion of the net income from the Trust Estate to which such deceased child would be entitled, if living, shall be paid in equal shares to such of my said children as shall be living, and to the children of any deceased child leaving issue surviving, the children of a deceased child to receive the parent's share per stirpes. In the event that any of my said children shall die prior to my decease, or thereafter while a portion of the Trust Estate is held for him or her, leaving issue surviving, then the Trustees shall pay the income from my Trust Estate to which such child would be entitled if living, to his or her issue, as the case may be, per stirpes, until such time as they shall attain the age of twenty-one years in the case of a son and eighteen years in the case of a daughter. Any income from my Trust Estate payable to the issue of a deceased child, as aforesaid, while such issue are under legal age may be paid by my Trustees directly to such issue from time to time or, in the discretion of said Trustees, be applied toward their support, maintenance and education until such issue shall have respectively attained the age of twenty-one years in the case of a son and eighteen years in the case of a daughter, and all payments so made shall be without liability to account therefor, either to their legal guardian or to any court of probate or otherwise.

"(d) When and as any son of a deceased child of mine reaches the age of twenty-one years, and when and as any daughter of a deceased child of mine reaches the age of eighteen years, my Trustees shall pay or transfer and assign in kind to my said grandchildren reaching such age, the portion or portions of

· 181

the Trust Estate to which they are respectively entitled, the children of a deceased child of mine to receive the parent's share per stirpes and not per capita. In the event that one or more of my said children shall have died without leaving issue surviving, or if all of the issue of a deceased child shall die while part of the Trust Estate is being held for one or more of them, then the portion of the Trust Estate which the issue of said deceased child, if any, would have received if they had survived him or her, as the case may be, and had lived to the age hereinabove set forth, shall be added to the portions of the Trust Estate to be distributed among the issue of my other children, as herein provided. In the event that a child of mine shall be living at the time that his or her son shall reach the age of twenty-one years, or his or her daughter shall reach the age of eighteen years, then at the death of my said child, my Trustees shall forthwith pay or transfer and assign in kind to such son or daughter of my said deceased child who has reached such age, the portion of the Trust Estate to which he or she is entitled hereunder."

During the years 1941 through 1950, Mary Isabelle Llewellyn executed 14 assignments involving substantially all of her remainder interests received under the Llewellyn Will. The assignments purported to be absolute sales of fractional portions of her remainder interests in the Paul P. Llewellyn and in the Gertrude Llewellyn Stone portions of the Trust Estate, which portions shall hereinafter be referred to as the "Paul portion" and the "Gertrude portion" respectively.

Upon the death of Paul P. Llewellyn in 1956, this complaint was filed by the City National Bank and Trust Company of Chicago, successor Trustee under the Will of Silas J. Llewellyn. The Continental Illinois National

182

Bank and Trust Company of Chicago subsequently succeeded the City National Bank and Trust Company as Trustee under the Will, and shall hereinafter be referred to as the "plaintiff-Trustee." The complaint, which was amended and supplemented upon the death of Gertrude Llewellyn Stone a short while after the death of Paul P. Llewellyn, sought the determination of the following matters:

(a) Defining the nature and extent of the interest of Mary Isabelle in the trusts created by the Will of Silas J. Llewellyn;

(b) Determining whether the interest of Mary Isabelle in the trusts created by the Will are lawfully assignable, and whether and to what extent her interests have been lawfully assigned;

(c) Determining whether or not any of the assignments executed by Mary Isabelle, if valid, have priority over other assignments executed by her;

(d) Determining whether any part of the corpus of the Trust Estate created by the Will of Silas J. Llewellyn became distributable upon the death of Paul P. Llewellyn;

(e) Determining whether any share of the corpus of said trusts now distributable to Mary Isabelle Llewellyn must be distributed in kind, or whether the same may be wholly or partly reduced to cash and distributed in cash, giving the Trustee directions in that regard;

(f) Determining whether the Trustee has the power of sale of assets of said trust, which may have become distributable upon the death of Paul P. Llewellyn, and giving the Trustee directions in that regard;

(g) Giving the Trustee directions with regard to the distribution of the Real Estate held under the Trust;

183

(h) Instructing the Trustee as to the disposition of the income which had accrued prior to the death of Paul P. Llewellyn, on the share in the Trust Estate held for Paul P. Llewellyn.

The complaint also requested instructions concerning the Gertrude share of the Trust Estate, a construction of the Llewellyn Will, approval of the Trustee's account, instructions concerning the administration of the Trust during the pendency of this action, and for fees and costs.

Named as parties-defendant in the suit were all those who claimed any interest in the Estate of Silas J. Llewellyn, and included the heirs of Silas J. Llewellyn, the beneficiaries under the Will and the assignees and sub-assignees of the Mary Isabelle Llewellyn assignments who had not theretofore settled their claims with Mary Isabelle, and who shall hereinafter be referred to as "assignees."

The issues as to the construction of the Llewellyn Will were tried by the Chancellor and on September 18, 1957, the Chancellor found and ordered, inter alia, that:

(a) Mary Isabelle, under the terms of the Llewellyn Will, is entitled to a remainder interest of one-third of the principal of the Trust Estate upon the death of her father, Paul P. Llewellyn, who died January 10, 1956, and that she is also entitled as such remainderman to all net income on said one-third of the principal accruing after January 10, 1956;

(b) Mary Isabelle became entitled as remainder-man to receive an additional one-sixth of the principal of said Trust Estate upon the death of Gertrude Llewellyn Stone, who died on April 14, 1956; and she is also entitled to receive the net income on said one-sixth share after April 14, 1956;

(c) Upon the death of Gertrude Llewellyn Stone one-sixth of the principal of said Trust Estate was to be added to the share of said Trust Estate held for the benefit of Elizabeth Llewellyn Warner; and she is also entitled to receive the net income accruing on the said one-sixth share after April 14, 1956;

(d) The Will does not contain, either expressly or impliedly, any spendthrift Trust provisions;

(e) Gertrude Llewellyn Stone, at the time of her death, did not possess any interest in the corpus of the Trust and Executor is not entitled to receive any share of the corpus.

On November 27, 1957, after it had been decreed that Mary Isabelle became entitled to the distribution of the remainders on the respective deaths of her father and her aunt, an order was entered referring the matters relating to the assignments executed by Mary Isabelle to Master in Chancery Henry E. Perry. The Master commenced hearings in 1957 and the hearings continued intermittently until June of 1962.

On February 26, 1963, the Master made his report in which he found that because the assignments were made for a "grossly inadequate consideration" and because Mary Isabelle was "in straitened financial circumstances" and was not in a position of equality with the assignees, "substantial justice" would be done by permitting Mary Isabelle to rescind the assignments, returning to the assignees the amounts actually received by her with 6% simple interest. The Master further found that the assignments purported to be absolute sales, were not gambling transactions nor void under section 49 of the Illinois Chancery Act, and recommended that the assignments be treated in effect as a loan to Mary Isabelle Llewellyn, to be repaid by her with interest. The Master recommended that he be allowed approximately $90,000 in fees to be charged against the distributable portions of

185

the Trust Estate. Objections to the report filed by the assignees were overruled, and on May 10, 1963, the Master made his revised and final report which had some slight variations from, but which was substantially the same as the original report.

In the meantime, on January 19, 1962, the plaintiff-Trustee filed a petition for leave to sell a substantial parcel of downtown Chicago Real Estate held under the Trust. The sale was objected to by the assignees and testimony was taken in support of the petition for the sale.

Exceptions to the final Master's Report were filed with the Chancellor in May of 1963, and during that following summer arguments on the exceptions were heard. On November 20, 1963, the Chancellor entered an order overruling all the exceptions as to the Master's Report and directing the presentation of a final decree. The decree was prepared and entered by the Chancellor on December 23, 1963. The decree provided for the approval of the Master's Report and the distribution of the Trust assets in accordance with the Master's recommendations; it incorporated the provisions of the former decree of September 18, 1957 (relating to the construction of the Will), provided for the sale of the Real Estate, and further provided that plaintiff-Trustee could make distribution either in kind or in cash, or partly in both forms as plaintiff-Trustee in its discretion should elect. The 1963 decree also provided for the requested allowance of fees to the Master and the allocations he had recommended, although it appears that no evidence was offered relative thereto.

Eleven appeals have been taken from the 1963 decree. The Warner and Stone appellants challenge the propriety of the Chancellor's construction of the Llewellyn Will. The Warner appellants maintain that, properly construed, the Llewellyn Will provides for the application of the entire Gertrude portion of the Trust Estate to the

Elizabeth Warner portion, since Mary Isabelle had become entitled to receive the Paul portion of the Trust Estate upon her father's death, thereby leaving nothing to which the Gertrude portion could be "added" under the terms of the Will upon the death of Gertrude Llewellyn Stone without children. The Stone appellants maintain they are entitled to one-third of the Llewellyn Estate, due to the fact that the Llewellyn Trust violates the Rule Against Perpetuities. The remaining appellants are the assignees of Mary Isabelle Llewellyn and maintain that the Master incorrectly found, and the Chancellor incorrectly decreed, that the assignees took unconscionable advantage of Mary Isabelle, who was in straitened financial circumstances, by acquiring her interests in the Llewellyn Trust for a grossly inadequate consideration in each instance. The assignees also assail the ruling of the Chancellor relative to the allowance of the Master's fees without having heard evidence in connection therewith, and also assail the Chancellor's approval of the sale of the real estate, the assignees claiming that the real estate should and could have been divided by assignment of fractional interests thereof to those persons entitled thereto.

We agree with the construction of the Llewellyn Will as determined by the Chancellor in the decree of September 18, 1957, incorporated in the 1963 decree.

Subparagraph (c) of paragraph Second of the Will disposes of the income from the Trust Estate after the death of the Testator's widow, creating three portions or shares in the Trust Estate in the Testator's three children and their respective offspring; the income was to be paid to the Testator's three children, the children of a deceased child of the Testator to receive the parent's share per stirpes. The Testator then provided for the possibility of one or more of his children dying without leaving issue surviving, by directing payment of such deceased child's portion in the income to the Testator's other children or, if dead, to their children, on a stirpital

basis. The final dispositive provision of sub-paragraph (c) directs payment of income, intended for a deceased child of the Testator who dies with issue surviving, to such surviving issue until such time "as they shall attain the age of twenty-one years in the case of a son and eighteen years in the case of a daughter."

Having created the Paul share, the Gertrude share and the Elizabeth Warner share in the Trust Estate, and having also provided for disposition of the income in subparagraph (c), the Testator then provides for the distribution of the corpus of the Trust Estate in subparagraph (d) of Paragraph Second of the Will. Expressly referring to the son or daughter of his deceased children and to "my said grandchildren," the Testator directs payment of the portion or portions created in subparagraph (c) to such grandchildren, on a stirpital basis when and as they attain the specified age. When a child of the Testator dies without leaving issue surviving, his portion of the Trust Estate corpus is to be added to the portions to be distributed among the issue of the Testator's other children, in the manner therein provided. Finally, in the event a child of the Testator dies after such child's son or daughter reaches the specified age, then immediately upon the death of such child of the Testator the share of the corpus is to be paid to the deceased child's son or daughter having theretofore reached the specified age.

The Warner appellants maintain that, applying the provisions of subparagraph (d) to the circumstances of this case, the Trustee was required, on the death of Paul P. Llewellyn in 1956, to make an outright payment to Mary Isabelle of the Paul portion of the Trust Estate. They further argue that, on Gertrude's death, the entire one-third portion of the Trust Estate which had been held for Gertrude's benefit during her lifetime should then have been held for the benefit of Elizabeth Warner during her lifetime and for distribution to Elizabeth Warner's issue upon her death. This latter contention is based on

188

the position that, since Mary Isabelle should have received her portion of the Trust Estate immediately upon her father's death, no portion of the Trust Estate was being "held for the benefit of" Mary Isabelle at the time Gertrude died to which the Gertrude portion could "be added" in accordance with the wording of the Will. The position of the Warner appellants overlooks the clear intention of Silas J. Llewellyn to divide his Estate equally between his three children and their respective offspring.

 In construing a will the court must consider the entire document and all the words used therein, giving them a natural and sensible meaning. The court will not consider some words and disregard others, nor will it add words not there, nor place a strained or peculiar meaning on them where such does not appear to be what the testator intended. Storkan v. Ziska, 406 Ill 259, 94 NE2d 185; Scott v. Crumbaugh, 383 Ill 144, 48 NE2d 532; Papa v. Papa, 377 Ill 316, 36 NE2d 717. Equal treatment of descendants of equal degree is preferred, rather than an excessive share being given to members of one group to the partial or total exclusion of members of another, equally meritorious group. Jackman v. Kasper, 393 Ill 496, 511, 66 NE2d 678. A peculiar or illogical scheme of distribution will not be followed where contrary to the clear intention of the testator, Peters v. Gebhardt, 6 Ill2d 534, 129 NE2d 731, and this intention will be determined as of the time the will was executed and not as of some later date after events have occurred which have fixed the rights under the will. Lydick v. Tate, 380 Ill 616, 44 NE2d 583. Finally, the court will generally prefer a construction of the will which most closely follows the statutes of descent. Cahill v. Cahill, 402 Ill 416, 84 NE2d 380; Condee v. Trout, 379 Ill 89, 39 NE2d 350.

 A reading of the entire Llewellyn Will leads inescapably to the conclusion that the Testator intended, and provided for, a logical and orderly distribution of the income and corpus of his Estate among the offspring of

his children. To his widow, the first and most natural object of his bounty, he gave the largest share of the Trust Estate income, the balance thereof to be shared equally by his three children. Upon the death of the widow, each of the Testator's three children was to receive one-third of the Trust Estate income. It is at this point that the Testator first manifests his intention to prefer the respective offspring of each of his children over his children as a group, by directing payment of the income, payable to his deceased child, to the children of such deceased child rather than to the surviving children of the Testator. Only in the event that a child of the Testator dies without leaving issue surviving, does the Testator direct the payment of this share of income to the Testator's other children or, if dead, to their surviving issue. The same intention is manifested by the Testator with regard to the distribution of the corpus in sub-paragraph (d). It cannot reasonably be claimed that Silas J. Llewellyn intended anything other than a preference to be given to the offspring of his respective children in the distribution of the income and corpus of the Trust Estate.

The Warner appellants strongly urge that the phrase "shall be added" found in subparagraph (d), precludes Mary Isabelle from sharing in the Gertrude portion of the Trust Estate. This interpretation however frustrates the Testator's manifest intention to treat the respective offspring of each of his three children equally, by conditioning the disposition of a portion of the corpus on the happenstance that a grandchild, whose parent has died, shall not have reached legal age before the death of a child of the Testator without issue surviving.

■■ The words immediately following "shall be added," are of utmost importance in understanding that phrase: ". . . to the *portions* of the Trust Estate *to be distributed* among the issue of my other children, *as herein provided.*" (Emphasis by the Court.) Consider-

ing the above wording in toto it is obvious that the Testator was not conditioning the application of such portion to the other portions of the Trust upon these latter portions still being in fact held for the issue of the Testator's other children; he was merely directing that such portion be applied to the other portions created under subparagraph (c) to be distributed in accordance with the other provisions of subparagraph (c) and (d). Under the Warner theory, if Mary Isabelle were under the age of eighteen when her Aunt Gertrude died, she would have been entitled to share in the Gertrude portion of the Trust Estate. Likewise, under the Warner theory, had Paul P. Llewellyn had another child and had that other child been under the age specified in the Will, and Mary Isabelle been over the specified age, at the time Gertrude died, that second child would be entitled to share in the Gertrude portion, whereas Mary Isabelle would not. Clearly, Silas J. Llewellyn did not intend to totally or partially disinherit a grandchild solely on the basis of adulthood, as evidenced by the final sentence of subparagraph (d) regarding payments to be made to adult grandchildren. The Warner theory gives a strained construction to the Llewellyn Will and an irrational distribution of the Trust Estate obviously not intended by the Testator. The scheme of distribution created by Silas J. Llewellyn is identical to the scheme of distribution contained in the Illinois Statute of Descent.

The Warner appellants maintain that, under the circumstances now in existence, their theory would result in a more equitable division of the corpus of the Trust Estate, since Mary Isabelle will share therein to the extent of one-third, namely, the Paul portion, and the two Warner children will share therein to the extent of one-third each, namely the Gertrude portion and the Elizabeth Warner portion. Not only does this argument violate "the per stirpes and not per capita" scheme of the Testator in providing for his children's children, but it

191

approaches the construction of the Llewellyn Will with circumstances which could not have been within the contemplation of the Testator at the time the Will was executed.

■ The final contention of the Warner appellants is that the Chancellor erred in refusing to admit into evidence two inter vivos trusts executed by Silas J. Llewellyn in 1920 and 1922. They argue that the wording of these trusts would be helpful in determining the intention of the Testator in the Will here in question.

It appears that these two inter vivos trusts were executed for completely different purposes than was the Llewellyn Will. Paul P. Llewellyn, the son of the Testator, was not made a beneficiary in either of these two trusts. Rather, the two inter vivos trusts provided only for the wife of Silas J. Llewellyn, Mary Llewellyn, and for his two daughters, Elizabeth Llewellyn, Warner and Gertrude Llewellyn Stone. It appears that the reason Paul was not made a beneficiary under these inter vivos trusts is that he received outright gifts of stock from the Testator during the Testator's lifetime.

It is difficult to see how these two trusts would be helpful in construing the Llewellyn Will. The Warners do not claim that the wording of the Will is ambiguous, nor do they show any relation between the trusts and the Will. On the contrary, the instruments were executed at different times during the life of Silas J. Llewellyn, for different beneficiaries and employed different language. Furthermore, and of utmost importance, the Will employs a different scheme of distribution, providing for a total family distribution, whereas the two inter vivos trusts were inter vivos gifts only to the female members of the family of Silas J. Llewellyn. The Chancellor did not err in refusing to admit these two trusts into evidence.

The question arises whether the Testator intended the remainders created under the Will as gifts over solely to

his grandchildren, or, as contended by the Stone appellants, as gifts over to the issue of his children in indefinite succession. If the former disposition was intended there is no violation of the Rule Against Perpetuities; if the latter was intended, the remainders over to the issue of the Testator's grandchildren must fail for violation of the Rule Against Perpetuities.

The position of the Stone appellants is that Silas J. Llewellyn intended his widow and his children to receive the use and benefit of the Trust Estate income during their lifetimes, and intended the corpus of the Trust Estate to descend through the stirpes to such of the remote issue of his children who attained legal age. They argue that under this construction of the Llewellyn Will, the gifts over to the issue of the Testator's children are void for violation of the Rule Against Perpetuities, for the reason that the vesting of such remainders is contingent upon the respective issue of the Testator's children reaching their majority. The Stone appellants conclude that because these gifts over of the corpus are void, the Stones are entitled to a one-third share of the corpus by virtue of the laws of descent regarding intestate property.

The Rule Against Perpetuities in its classic sense has been adopted by the courts of this State. The Rule is simply stated in Chicago Title and Trust Company v. Schellaberger, 399 Ill 320 at page 333, 77 NE2d 675:

> "Professor Gray's classic definition of the rule against perpetuities is that 'No interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest.' (Gray, Rule Against Perpetuities, 2d ed, Sec 201; Corwin v. Rheims, 390 Ill 205.) If by any possibility the interest does not vest within this time, it comes within the rule and the estate attempted to be created must fail."

193

The Rule Against Perpetuities is a rule of law and cannot be used to determine the intent of the testator. On the contrary, its very purpose is to defeat the intention of a testator who creates a limitation which is too remote and which may not vest within the period prescribed by the Rule. Consequently, the intention of the testator must first be determined by a construction of the will as if the Rule were non-existent. Only after such intention has been determined will the Rule be applied. See Millikin Nat. Bank of Decatur v. Wilson, 343 Ill 55, 64, 174 NE 857; Dime Sav. & Trust Co. v. Watson, 254 Ill 419, 427, 98 NE 777.

 Subparagraph (d) of paragraph Second of the Will creates the gifts over after the life estates created in subparagraph (c). The first sentence of subparagraph (d) provides for the distribution of the corpus to the Testator's grandchildren "when and as, any son of a deceased child of mine reaches the age of twenty-one years, and when and as any daughter of a deceased child of mine reaches the age of eighteen years," the children of a deceased child of a Testator to receive the parent's share per stirpes and not per capita. The third and final sentence of subparagraph (d) provides for the situation where a son or daughter of the Testator's child reaches legal age while such Testator's child is still alive; in that event, such son or daughter is to receive the share to which he or she is entitled immediately upon the death of such Testator's child. The second sentence of subparagraph (d) directs the application of the share which would have passed in accordance with the first or third sentence but for the fact that the Testator's child died without leaving issue surviving.

The first question for determination is whether the Testator intended the term "issue" to mean "descendants of the remotest degree," or to mean his immediate grandchildren.

In the first sentence of subparagraph (d) the Testator refers to the objects of his bounty not merely as a "son of a deceased child of mine" and a "daughter of a deceased child of mine," but specifically describes them as "my said grandchildren." Likewise, in the third sentence of subparagraph (d) he refers to them as "the son or daughter . . . of a child of mine" and as "such son or daughter of my deceased child." It clearly does not appear that the Testator meant anything other than "grandchildren" when he used that term, especially when considered in the light of the other references concerning the beneficiaries of the gifts over made in these two sentences. The Stone appellants' argument that these words should be considered as a reference to remote descendants, is both unnatural and senseless, especially in view of the fact that the Stones do not advance any sound reason for employing such construction.

While the second sentence of subparagraph (d) does refer to the term "issue," this reference is made in connection with the direction to apply the portion, of a child of the Testator dying without issue surviving, to the other portions *to be distributed* among the issue of my other children, *as herein provided.*" (Emphasis by court.) Since the phrase "as herein provided" relates to the first and third sentence of subparagraph (d), and since these two sentences relate solely to the Testator's grandchildren it follows that the Testator was referring to his immediate grandchildren when he directed application of such portion to the other portions "to be distributed to the issue of my other children." Consequently, when the Testator employed the term "issue" in the second sentence, he was referring to his immediate grandchildren. There is no basis upon which an argument can be predicated that the Testator intended the term "issue" to have two different meanings within this Will, much less within the same sentence. Gridley v. Gridley, 399 Ill 215, 223, 76 NE2d 146.

195

■■ ■■ The foregoing construction of the term "issue" is fortified by the fact that, in his directions in the second sentence of subparagraph (d) to apply one portion to the other portions, the Testator described said portion as that "which the issue of said deceased child, if any, would have received if they had survived him or her, as the case may be, and had lived to the age hereinabove set forth. . . ." The reference here is again to the ages specified in sentences one and three, both of which relate solely to the Testator's immediate grandchildren. The Stone appellants' contention that the word "issue" means "descendants of the remotest degree" under the Illinois cases, is unavailing. While this may be its ordinary meaning, Stewart v. Lafferty, 12 Ill2d 224, 227, 145 NE 2d 640, it does not necessarily follow that this meaning was intended by any given testator, or, more specifically, by Silas J. Llewellyn. Greenfield v. Lauritson, 306 Ill 279, 137 NE 818; Storkan v. Ziska, 406 Ill 259, 94 NE2d 185. Caution must be exercised in applying precedents in will construction cases. Sloan v. Beatty, 1 Ill2d 581, 590, 116 NE2d 375. The particular will under construction must be given primary consideration in the interpretation of its wording and in the determination of the intention of the testator.

■■ The argument that, because the Testator directed a stirpital disposition of the corpus among the issue of his children, indicates he intended a gift over of the corpus to the "descendants of the remotest degree," is likewise unavailing. A reading of subparagraph (d) shows that the gifts over of the remainder of the corpus were given to the Testator's grandchildren as a single class generally, as evidenced by the first part of the first sentence thereof. In line with his intention to prefer the offspring of his respective children the Testator provided for a stirpital distribution to avoid the possibility of any grandchild sharing in anything other than his or her particular parent's share, except in the case of a por-

196

tion payable to a Testator's child who dies without issue surviving. Having initially given the remainder to his grandchildren as a class they could otherwise share, on a per capita basis, in a portion other than that of their respective parents had the stirpital direction not been employed. The stirpital provisions in subparagraph (c), relative to grandchildren sharing in the income of the Trust Estate leads to the same conclusion. When the stirpital provision is employed it always follows a general direction to pay the income, and is consequently employed to eliminate the possibility of one set of grandchildren sharing in a portion of income which was not payable to their particular parent, except again in the case of a portion payable to a Testator's child who dies without issue surviving. It is significant that the directions in subparagraphs (c) and (d), to apply the portion of a Testator's child who dies without issue surviving, first direct payment thereof equally between the remaining portions and then provide for a general distribution to the grandchildren, limiting their interest therein only to the particular parent's share by the use of the stirpital provision.

The case of Watson v. Goldthwaite, 345 Mass 29, 184 NE2d 340 cited by the Stones in support of their position that "issue" means "descendants of the remotest degree" when used in connection with the stirpital provision, is clearly distinguishable on its facts. In Watson, the court stated that it was not apparent from the will there in question that the term "issue" was intended to be limited to "children." Not only does the Watson case strengthen what we have said above concerning the caution which must be taken in applying precedents in will construction cases, but the Llewellyn will clearly indicates what the Testator intended by his use of the term "issue" and by his use of the stirpital provisions.

 Finally, it cannot be doubted that the Testator intended the gifts over as vested remainders, subject

to open to admit afterborn grandchildren and subject to complete defeasance upon the death of a grandchild before reaching the specified age. The words "pay or transfer and assign" to the grandchildren upon their reaching the specified age indicates that only the possession and enjoyment was postponed and not the vesting of the interest, especially in view of the fact that the same words are employed where the grandchild has reached the legal age while his or her parent is still alive. Also important is the fact that the Testator used the words "to be distributed" in connection with the application of the portion of a Testator's child dying without issue surviving to the other portions of the Trust Estate. The words "to which they are respectively entitled" used in sentences one and three of subparagraph (d) strengthen this holding. Mere postponement of possession and enjoyment beyond the limits of the Rule Against Perpetuities does not of itself cause the interest to fail for violation of the Rule. See Carey & Schuyler, Illinois Law of Future Interests, chap 14, § 497, and cases cited therein. The "lives in being" are the children of the Testator, and therefore the remainder interest to the grandchildren must vest, if at all, within the "life or lives in being" as prescribed by the Rule.

It appears that the Rule Against Perpetuities was not raised by the Stone appellants before the Chancellor nor was it in any way mentioned in their Notice of Appeal. They argue however that unlike the ordinary cases, it is well settled that the court in a will construction case is not limited to the constructions contended for in the pleadings of the parties, but may consider such questions within its jurisdiction as are relevant to the inquiry. The Stones maintain that even under the general prayer for relief the court has the power to construe the will and grant relief notwithstanding the issues framed by the pleadings, citing Jusko v. Grigas, 26 Ill2d 92, 186 NE2d 34; Gridley v. Gridley, 399 Ill 215, 76 NE2d 146; Smith

198

v. Burt, 388 Ill 162, 57 NE2d 493; and Continental Illinois Nat. Bank & Trust Co. of Chicago v. Art Institute of Chicago, 341 Ill App 624, 94 NE2d 602, affirmed, 409 Ill 481, 100 NE2d 625.

 ██ While we agree with the Stone appellants' contention that the court in a will construction case is not limited to the construction issues framed by the pleadings, we disagree that the Rule Against Perpetuities may be raised on an appeal where it has not been raised below. As the Stones themselves point out, the Rule Against Perpetuities is a rule of law and not a rule of construction. Therefore, being a rule of law, it cannot be raised for the first time on an appeal. The cases cited by the Stone appellants have no bearing on this precise issue, since they all deal with questions of construction not raised in the trial court, and in no way deal with the attempted advancement of the rule of law for the first time on an appeal.

Turning to the issues involving the assignments made by Mary Isabelle Llewellyn of her remainder interests in the Llewellyn Trusts during the years of 1941 through 1950, a brief description of the life of Mary Isabelle and of the facts surrounding the respective assignments is necessary to a better understanding of the transactions.

Mary Isabelle Llewellyn was born March 6, 1917, and lived with her parents in Evanston, Illinois until 1924. She attended various elementary schools in the suburban Chicago area and ended her formal education after two and one-half years of high school. In 1924 her parents were divorced and Mary Isabelle lived with her mother in Evanston in a home which her mother inherited from her mother's father. In addition to the home in Evanston, Mary Isabelle's mother received securities and cash valued at approximately $67,000 through the inheritance. Pursuant to the divorce decree involving Mary Isabelle's parents, her mother received $900 per month in alimony until 1933 or 1934, and $200 per month in child support

199

until Mary Isabelle reached the age of eighteen in 1935. The alimony was reduced to $300 in 1933 or 1934 and was settled by a lump sum payment of $25,000 in 1934.

In 1934, after having sold the home in Evanston and after having been foreclosed out of various other homes in the suburban Chicago area, Mary Isabelle and her mother moved from Chicago to a farm which her mother had purchased in East Greenwich, Rhode Island. In early 1936, Mary Isabelle married Emil Frank and assisted him in the operation of a 50-room hotel which they had leased in Rhode Island, and on which they relied for their living. The same year Mary Isabelle, her husband and her mother moved to Maryland from Rhode Island and lived for several years in various homes and farms in the vicinity of Washington, D. C.

The first attempt by Mary Isabelle to use her remainder interest in the Llewellyn Trust Estate as a source of funds came in 1936 when she endeavored to secure a loan from the City National Bank and Trust Company of Chicago which was then the Trustee under the Llewellyn Will. After several discussions between Mary Isabelle, her father Paul, and the Trustee, the negotiations failed.

In 1937, Mary Isabelle was divorced from Emil Frank, and later married Ross Callison. She and her mother rented a 40-acre farm near Rockville, Maryland, and during this period Mary Isabelle worked as a free lance artist in the Washington, D. C. area.

In 1938, Mary Isabelle consulted Attorney William Mac-Cracken of Washington, D. C. concerning her grandfather's Estate, with the intention of having MacCracken determine whether she would be able to receive some form of loan or advance on whatever interest she had in the Llewellyn Trust Estate. MacCracken obtained a schedule of assets from the Llewellyn Trustee and later gave Mary Isabelle an opinion, dated March 25, 1939, that her interest in the Llewellyn Trust Estate was vested. After MacCracken procured the schedule of assets

from the Trustee, Mary Isabelle received a similar schedule each succeeding year. It appears that Mary Isabelle later procured two, and possibly three other opinions concerning the Llewellyn Trust from other attorneys.

In 1938, after consulting Attorney MacCracken, Mary Isabelle answered an advertisement in a Baltimore newspaper with the view of obtaining funds by use of her remainder interest. She consulted A. B. Hirschman, the party who advertised in the Baltimore newspaper with regard to making loans to heirs, and Hirschman advised Mary Isabelle and her mother to consult with Attorney Irving F. Mezger of Baltimore. Mary Isabelle saw Mezger the same day she saw Hirschman.

During the years 1939 and 1940, Attorney Mezger, acting for Mary Isabelle, negotiated for the purchase of two farms and also a loan from the Union Trust Company of Baltimore secured by an assignment of Mary Isabelle's interest in the Llewellyn Trust. None of these deals was concluded.

It appears that between 1940 and 1941, Mary Isabelle, with the idea of pledging her interest in the Llewellyn Trust for a loan, authorized Attorney Mezger to accept a proposition based upon an outright and absolute sale of a fractional part of her interest in the Trust Estate.

During the period that Mary Isabelle was negotiating for assignment of her interest there was extensive correspondence between her father and the Llewellyn Trustee. It appears that in August of 1940, after receiving a request by Mary Isabelle for a form of assignment to employ in assigning a portion of her interest under the Llewellyn Will, the Trustee requested advice from Mary Isabelle's father. Mary Isabelle's father advised the Trustee to "put every legal obstacle in her way" by advising her that the Trustee had no draft forms of assignment. He also requested that the Trustee suggest that Mary Isabelle have her Attorney draw up a draft of the proposed assignment and submit it to the Trustee for

201

consideration. The Trustee was also requested by Paul P. Llewellyn to ask Mary Isabelle if she had investigated the persons with whom she was dealing. It further appears that in March of 1940, Mary Isabelle's father requested the Trustee to investigate the character of the Union Trust Company of Baltimore (with whom Mary Isabelle was then in the process of negotiating an assignment) and the character of Attorney Mezger; Mary Isabelle's father was of the opinion that Attorney Mezger's requested fee for handling the proposed assignment was honest. Mary Isabelle had been specifically warned by her father against the advisability of making the proposed assignments, and had later been told by the Trustee that she was "working up a fine lawsuit" in connection with the assignments.

In February of 1939, Mary Isabelle wrote a letter to Attorney Mezger wherein she requested Mezger to try to receive $30,000 for an assignment of a fraction of her remainder interest then having a face value of $200,000, but stated that in the event the figure was too high and stood "in the way of a quick deal then go ahead on the best" he could receive. She authorized "10-for-1 if necessary, but get the money now." In May of 1941, Mary Isabelle wrote to Attorney Mezger in relation to a pending assignment, closing the correspondence with "Best of luck to you and I feel that this deal is finally in good hands." In a postscript to the same letter, Mary Isabelle stated that there was nothing more to wait for with regard to the closing of the deal, since all the details had been decided upon before.

The first successful assignment of a fraction of Mary Isabelle's remainder interest occurred in September of 1941 with William Simon and was concluded in New Jersey. Thereafter, and until July, 1943, Mary Isabelle entered 6 other assignment transactions. One transaction was concluded in New Jersey in September of

1941 (Mastan assignment), two were concluded in New York in April of 1943 (Lobel, Brown assignments), and three were concluded in Maryland in April and July of 1943 (two Masons and first Fidelity-Philadelphia assignments). On each occasion Mary Isabelle executed an absolute assignment of a fraction of her remainder in the Paul share of the Llewellyn Trust, all seven assignments totaling five-sixths of the entire Paul portion. In her answer Mary Isabelle admits receiving the sum of $47,500 for these seven assignments. The greater portion of the amounts so received were used for the purchase and improvement of Chop-Mist Farm, an 80-acre farm in Rockville, Maryland, in 1943. On this farm Mary Isabelle engaged in the business of training, showing, and boarding horses, and raising crops and chickens. In 1942, Mary Isabelle also worked for the Army Map Service in Washington, D. C., and her mother was employed by the Weather Bureau.

At the closing of each of the seven assignments Mary Isabelle was represented by Attorney Mezger, who was brought into each transaction by Mary Isabelle. It further appears that Attorney Mezger had no prior acquaintance with any of the assignees involved. In each instance Mary Isabelle executed the assignment herself, acknowledging that it was her free and voluntary act and deed. Mary Isabelle, in each instance, signed an affidavit stating the transaction had been explained by Attorney Mezger and that the consideration involved was acceptable to her. With respect to each transaction Mary Isabelle herself testified on cross-examination that prior to each closing, she had negotiated with either Attorney Mezger, Harry Sanger, her broker, or Leonard P. Levy, another broker, and had agreed upon the amount of money that she was to receive for each assignment. She further testified that she knew in each instance the fraction of her remainder interest which was to be as-

signed and that after each closing she actually received the precise amount of money which she had agreed upon prior to the closing.

The amount received by Mary Isabelle for each assignment was substantially less than the amount paid by the assignees, the balance having been retained by Mezger and Sanger for attorney and broker fees as agreed upon by Mary Isabelle. This practice was continued in the subsequent assignments as well.

In 1944, Mary Isabelle executed her eighth assignment of a fraction of her remainder interest in the Paul share. This assignment was negotiated by Mary Isabelle herself and negotiated with Leonard P. Levy, by telephone and the U. S. mails. She consulted Attorney Thomas Anderson of Rockville, Maryland; Mr. Anderson later became a Judge of the Sixth Judicial Circuit of Maryland. Mary Isabelle became acquainted with Attorney Anderson in connection with the purchase of Chop-Mist Farm and considered Anderson to be a "very reputable attorney." Mr. Anderson testified that Mary Isabelle came to his office and that he examined the assignment papers and executed them with Mary Isabelle after she stated that she fully understood them, that the consideration she had agreed upon was satisfactory to her and that she wished to execute the documents. Judge Anderson also testified that Mary Isabelle was "very intelligent" and that she fully understood everything that transpired between them. It does not appear that Attorney Mezger was involved in this transaction.

Mary Isabelle lived in Rockville, Maryland until the winter of 1945–46, when she decided to sell Chop-Mist Farm and move to Greensboro, North Carolina. The reasons given for this move by Mary Isabelle were that she decided to go into the freezer-locker business upon the advice of her mother's husband and that Greensboro seemed like a very good place to operate such a business, and further that her mother was in poor health and

needed a warmer climate. Mary Isabelle paid $80,000 for the business. She received in excess of $30,000 from the sale of Chop-Mist Farm, and a substantial amount was borrowed against a chattel mortgage on the freezer-locker equipment and against a mortgage on a home she had purchased in Greensboro. The balance of the $80,-000 came from an assignment of another fractional part of her interest in the Llewellyn Estate made in March of 1946.

The broker involved in the 1946 assignment was Harry Sanger. Mr. Sanger secured buyers who were willing to purchase the entire balance of Mary Isabelle's interest for the sum of $20,000, which offer Mary Isabelle rejected. Mr. Sanger then contacted Benjamin Byer, an attorney who prepared a prospectus setting forth the nature of the interest to be assigned, the provisions of the Llewellyn Will, the status of the persons involved, and the Trust assets. The prospectus also set out the various legal problems involved and gave an opinion as to the vested or contingent nature of Mary Isabelle's remainder interests. Mr. Byer secured purchasers and the assignment was made in March of 1946, in Philadelphia. Mary Isabelle received $15,000 for the assignment, which amount had been previously agreed upon by her.

Mary Isabelle testified that she signed the March, 1946 papers voluntarily, that no one "had a brickbat over her head," that the deal was acceptable to her and that she signed the papers because she wanted money to go into the freezer-locker business. She had no recollection of anyone saying anything that could have been a misrepresentation of the fact. She also testified that she felt the consideration for this transaction was adequate at the time she made the assignment, and considered it as adequate until this lawsuit was commenced in 1956.

After the move to Greensboro in 1946, Mary Isabelle improved the farm but in the course of 2 or 3 years the freezer-locker business proved to be a failure. Mary

Isabelle made additional assignments providing additional money in 1947, 1949 and 1950. The facts surrounding the balance of her assignments were much the same as those surrounding her prior assignments. By 1953, Mary Isabelle had assigned almost all of her remainder interest in the Llewellyn Estate. In 1953 she moved to Maryland and then to Virginia, where she was living when her father Paul died in January of 1956, and when this suit was commenced in March of 1956.

In each of the assignments, except that of March, 1946, Mary Isabelle was required to procure life insurance policies in varying amounts. The various assignees were made beneficiaries and paid the premiums on the policies.

The assignments made by Mary Isabelle Llewellyn during the years 1940 through 1950 were executed in the States of North Carolina, New York, Maryland, New Jersey and Pennsylvania. To be determined initially is the question of whether the law of each of these States controls the validity of the respective assignments, or whether the law of the State of Illinois, the situs of the administration of the Llewellyn Trust, is controlling.

It appears that the law of the States in which the assignments were executed permit the assignment of future interests under the proper circumstances, as does the law of Illinois: Benson v. Benson, 180 NC 106, 104 SE 68 (1920) ; In re Strange's Estate, 300 NYS 23, 164 Misc 929; Keys v. Keys, 148 Md 397, 129 A 504 (1925) ; Fidelity Union Trust Co. v. Reeves, 98 NJ Eq 412, 125 A 582 (1924) ; Biddle v. Biddle, 363 Pa 426, 70 A2d 281; and Mees v. Steffey, 310 Ill 161, 141 NE 419. It is therefore immaterial whether the Illinois law or the law of the States where the contracts were entered is employed regarding the validity of the said contracts. The sole question is whether the contracts were entered in good faith, were given for a good consideration, and involved no fraud or overreaching, so as to be enforceable in a court of equity.

206

■■■■■■■ A court of equity will enforce a contract even where the consideration is grossly inadequate, where there has been no fraud or overreaching on the part of the parties thereto. Stipanowich v. Sleeth, 349 Ill 98, 181 NE 632. This same rule is applicable to assignments of remainder interests. Mees v. Steffey, 310 Ill 161, 141 NE 419. While inadequacy of consideration, and more specifically gross inadequacy of consideration, may itself constitute evidence of fraud, Burroughs v. Mefford, 387 Ill 461, 56 NE2d 845; Logue v. Von Almen, 379 Ill 208, 40 NE 2d 73, it does not of itself constitute conclusive evidence of fraud. Mees v. Steffey, 310 Ill 161, 141 NE 419.

The Master concluded, and his conclusions were adopted by the Chancellor, that "the consideration paid for each assignment was so grossly inadequate as to shock the conscience of a court of equity and to necessitate relief in equity from the literal provisions of the respective assignments which represented in each instance an unconscionable bargain," and "a court of equity is particularly impelled to this conclusion by virtue of the circumstances that each of the assignments represents an improvident and unconscionable bargain to which the assignor, Mary Isabelle Llewellyn, was constrained by the stress of financial circumstances, lack of business experience and ignorance." From the circumstances of this case, we are of the opinion that the Master and the Chancellor erred in arriving at these conclusions, and in further determining that these transactions be treated as loans, repayable with simple interest.

At the outset it must be borne in mind that, prior to each assignment, Mary Isabelle was in no way indebted to any of the assignees. Consequently, we are not here dealing with assignments made by a debtor to her creditor, but rather with assignments made by one desirous of obtaining funds immediately, rather than waiting for future events to occur.

207

 The record clearly does not support the Master's conclusion that "the amounts paid for the various assignments were so grossly inadequate as to shock the conscience of a court of equity." On the contrary, the only evidence in the record directly bearing on the adequacy of the consideration, namely, the testimony of Mr. Samuel Cohen, is that Mary Isabelle Llewellyn actually received more than the value of the interest assigned, based upon the risks involved. No evidence was offered to refute this testimony.

 While Mary Isabelle had the burden of showing that the consideration she received was inadequate, the only evidence she offered which had the slightest bearing on this issue was the table of the Trustee's semi-annual valuation of the Trust assets. But proof of the value of the Trust assets was not proof of the value of Mary Isabelle's remainder interest in those assets and did not even tend to prove the value of the remainder. The remainder was not distributable when the assignments were made, and it was uncertain at the time the various assignments were made whether or not the particular interest assigned would ever become distributable to Mary Isabelle and, if it did, when that would be. This is so because the life tenants, who were middle aged, were still living and might be expected to live for many years. In addition, there were a number of other contingencies, which shall be dealt with hereafter, that the assignments might wholly fail or that the Trust assets passing thereunder might be reduced in value or amount before they became distributable.

The amounts received by Mary Isabelle for these various assignments ranged from 5.4% to 13.4% of the cash value at the time of the assignment of the fraction of the particular share assigned. The amounts paid by the assignees, however, were in excess thereof. The balance between the amount actually received by Mary Isabelle and the amount actually paid by the assignees appears to

208

have been held for attorney's fees and broker's commissions, as agreed upon by Mary Isabelle prior to the execution of each assignment. In each instance Mary Isabelle had agreed upon the amount of consideration in advance of the particular assignment, and it clearly appears from the record that she considered the amounts so received by her to be adequate. Her correspondence connected with the negotiations for the assignments show that the amounts which she was requesting was substantially the same as that actually paid by the assignees in each instance. As a matter of fact, Mary Isabelle herself testified at the hearing before the Master that the consideration which she received for the March, 1946 transaction (5.4% of the value of the portion assigned) was adequate, and that she considered it to be adequate until this action was filed some 10 years later. It will be further noted that the 5.4% figure was the lowest percentage figure involved in all fourteen assignment transactions. The adequacy of the consideration received by Mary Isabelle for all the assignments was never questioned by her until after the events occurred which, under the Will, would have entitled her to substantially more money than she received from the assignees.

 The Master's finding, adopted by the Chancellor, is partly based on the conclusion that the assignees took advantage of Mary Isabelle's poor health, lack of business experience and intelligence, and lack of funds. We disagree.

While the evidence shows that Mary Isabelle may not have gone to college, she did receive two and one-half years of formal high school education. Her activities after the age of eighteen show that whatever Mary Isabelle lacked in formal education she more than made up in practical education. At the age of nineteen she married and assisted her husband in the operation of a 50-room hotel in Rhode Island, and supervised the hotel personnel.

209

At the same age she began negotiations for loans, attempting to use her remainder interest under the Will as security therefor. During the following 5 years she negotiated for the purchase of 4 or 5 farms in Maryland, Virginia and Tennessee, again attempting to use her remainder interest as security for loans. In all of these negotiations Mary Isabelle had the assistance and advice of either Attorney Mezger or other attorneys of her own choosing.

As far as lack of intelligence is concerned, two attorneys consulted by Mary Isabelle in Maryland and in North Carolina, each testified that they were of the opinion that she was "very intelligent." Attorney Anderson, who later became a Judge in the State of Maryland, testified: "Yes, she was a very intelligent person. . . . It is my opinion that she was perfectly able to comprehend everything that went on. The matter [of the proposed assignment] was discussed at some length and it was my opinion that she certainly understood everything that took place." The testimony of Attorney Claude Pierce, Jr., concerning three assignments executed by Mary Isabelle in 1949 and in 1950, was to the same effect.

It is difficult to reconcile the Master's conclusion, that Mary Isabelle Llewellyn lacked business skill and intelligence, with the evidence directly bearing on her intelligence, as well as her correspondence during the years of 1936 through 1950. In 1936, negotiations were had with the Llewellyn Trustee concerning the possibility of obtaining a loan from the Trustee with an assignment of Mary Isabelle's interest as security therefor. During these negotiations Mary Isabelle was accompanied by, and received the advice of, her father, Paul P. Llewellyn. While these negotiations eventually came to naught, Mary Isabelle began to acquire the experience and skill which the Master concluded she lacked at the time she made the assignments. Mary Isabelle thereafter consulted several attorneys concerning her position as a remainderman

210

under the Llewellyn Will. As early as February of 1939, in her correspondence with Attorney Mezger, Mary Isabelle evidenced some of that "acquired business knowledge" when she stated, "I am enclosing the inventory and wish you would go to New York on this case if it is possible. I am sure you could drive a much better deal if you talked to them personally. . . . Try to get $30,000 for $200,000, but if this stands in the way of a quick deal, then go ahead on the best you can get. 10-for-1 if necessary. But get the money now." In other correspondence with Attorney Mezger in 1941, Mary Isabelle speaks of powers of attorney, of details of the assignment having already been decided upon, of setting up the assignment papers without entering the amounts of consideration due to the possibility of assigning a greater portion, of having a prospective assignee who was "really ready to sign up," of negotiations on her own with another prospect and setting out the proposition in detail, and the like. One of her propositions was put on a "take it or leave it" basis. The correspondence in evidence, too voluminous to deal with here in detail, all indicates Mary Isabelle Llewellyn did not lack business experience and intelligence. Finally, Mary Isabelle was warned more than once by her father and by the Llewellyn Trustee concerning the advisability of making the assignments. Although the Llewellyn Trustee attempted to frustrate Mary Isabelle's intended assignments, her correspondence clearly indicates nothing was going to stand in the way of the proposed assignments; she requested "a neutral attitude" to be entertained by the Trustee and by her father with respect to her proposed assignments.

As to Mary Isabelle's "straitened financial circumstances," it must first be remembered that Mary Isabelle in each instance pressed for the closing of the assignment, in each instance agreed upon the consideration to be received therefor, and in each instance considered the amount of consideration to be adequate. The weight of

211

her argument is weakened by the fact that, rather than attempt to obtain cash or the like in each of the negotiations prior to the first assignment in 1941, Mary Isabelle attempted to purchase farms by use of her remainder interest. During the years of 1941 and 1942 both Mary Isabelle and her mother were employed by the Federal Government in the Washington, D. C. area. During this period Mary Isabelle also worked as a commercial artist. In her answer, she admits to receiving $47,000 for the seven assignments made between the years 1941 and 1943, the purchasing power of which amount in those years was greatly in excess of its purchasing power in 1956 or its purchasing power today. A large portion of the sums so received were used for the purchase of an 80-acre farm in Rockville, Maryland, known as Chop-Mist Farm, on which Mary Isabelle trained and boarded horses, showed them professionally, and raised crops and chickens. In 1946, Mary Isabelle spent some $80,000 for the purchase of a freezer-locker business in North Carolina. These facts show that Mary Isabelle was not in such dire financial need as she would have the court believe.

The claim is also made that Mary Isabelle was in very poor physical condition during this entire period, and that this contributed to her vulnerability. This argument is greatly shaken by the fact that her physical health was sufficiently good for her to pass medical examinations for thirteen separate life insurance policies from 1941 through 1950, and by the further fact that she was physically able to train, board and professionally show horses and raise crops and chickens on her Chop-Mist Farm in 1943. In this connection it is interesting to note that in almost every instance that Mary Isabelle negotiated for the purchase of a dwelling place, it involved a farm of one type or another.

While Mary Isabelle charges the assignees with fraud and overreaching, no evidence appears in the record substantiating this allegation. The assignees are por-

trayed as "unscrupulous money-lenders" in search of necessitous heirs, yet no evidence appears in this regard. On the contrary, Mary Isabelle herself pressed the negotiations for the various assignments, and in fact testified that she could not remember anything having been said in connection with the negotiations which could be taken as a misrepresentation of fact. It clearly appears from all the circumstances that this attempt by Mary Isabelle Llewellyn to destroy the validity of assignments, freely and voluntarily entered by her, is nothing more than an attempt to take advantage of a beneficial situation, but to avoid the risks and burdens involved.

 The ruling of the Master that the assignments be treated as mere loans, repayable with simple interest, appears to be based upon the conclusion that the transactions involved grossly inadequate consideration and overreaching. Not only does the evidence not sustain this conclusion, but the assignment papers as well as Mary Isabelle's own actions, show that absolute sales were intended and in fact made.

After the assignments were executed, Mary Isabelle treated them as absolute sales of her remainder interests under the Llewellyn Trust. Her correspondence with several of the assignees, after the assignments had been executed, speak of "repurchasing" the particular interests in question. In a letter to Leonard P. Levy she stated that "once the assignments were recorded with the Trustee there would be no way of getting them back." After repurchasing a certain fractional interest from Levy in 1955, the papers were forwarded to the Trustee, bearing the notation that the interest had been "purchased" from Levy. As early as 1942, Mary Isabelle's correspondence used such words as "buy," "sell," "selling," and the like. In October of 1953, one of the assignees attempted to obtain a list of the Trust assets from Mary Isabelle after such request was denied by the Trustee. Mary Isabelle was willing to sell a copy thereof to him

213

for $250, stating that it was the only way he could obtain a copy. The import of Mary Isabelle's entire letter, and the assignee's reply thereto, strongly indicates that the assignee was the owner of the interest and not merely a creditor secured by the remainder interest. The record is replete with correspondence of this nature, showing that Mary Isabelle intended to and in fact did make absolute sales of her remainder interest.

Mary Isabelle however maintains on this appeal, as she did before the Master and the Chancellor, that these assignments are usurious loans and are therefore void, citing the cases of DeKorwin v. First National Bank of Chicago, 170 F Supp 112, affd 275 F2d 755, and De Korwin v. First Nat. Bank of Chicago, 318 F2d 176, in support of this position. The courts in the DeKorwin cases held that the assignments were made to secure loans, rather than holding that they were usurious loans, which holding would have resulted in a complete loss of the assignees' investments. The DeKorwin courts applied this "loan theory" primarily due to the fact that the assignor was required to pay for life insurance for the assignees' benefit and the fact that the assignments called for repayment of dollar amounts to the assignees. The Master here followed the reasoning of the DeKorwin courts, and found that the assignments were not usurious loans, but that equity would be served by treating them as loans, repayable with simple interest. However, the situations presented in the DeKorwin cases and that involved here differ greatly.

In the instant case, the assignments do not call for repayment of dollar amounts as they do in the DeKorwin cases, but on the contrary, they are assignments of fractional parts of Mary Isabelle's interest in the Trust Estate. Furthermore, in the DeKorwin cases, the assignor was required to pay the life insurance premiums; here, however, the premiums were paid solely by the as-

214

signees, except for the March, 1946 assignment which involved no insurance whatsoever.

Thirdly, the risk factors differ greatly between the two situations. In the DeKorwin cases it appears that the only risk taken by the assignees was that the assignor survive one aged life tenant; this risk was obviated, however, by the fact that the assignor was required to obtain and pay for life insurance on his own life for the benefit of the assignees, the amount of the insurance being equal to the amount paid by the assignees for the assignment. Here, the insurance was paid for by the assignees, thereby increasing the amount of their investment to that extent.

Additional substantial risks are involved here: the possibility of a decline in the market value of the assets of the Trust, since a fractional interest was assigned rather than a dollar amount; the possibility of Mary Isabelle's father, Paul P. Llewellyn, having additional children, in view of his three subsequent marriages, the last two of which occurred in 1939 and in 1945; the possibility of Gertrude Llewellyn Stone having children; the discount for the postponement of possession of the interest by the assignees; the possibility of a lawsuit in connection with the assignments; and the like. Finally, and of utmost importance, the assignors in the DeKorwin cases offered evidence concerning the adequacy of the consideration given for their assignments; here, on the other hand, no such evidence was offered by Mary Isabelle Llewellyn. The facts in the DeKorwin cases are clearly distinguishable from the situation involved in the instant case.

 Mary Isabelle would have this court condemn outright all such assignment transactions as being usurious loans, apparently without considering the circumstances of each case. The effect of such a ruling would be to render inalienable all remainder interests, and would not be in accord with the law of this State which permits the enforcement of such contracts, when entered in

215

good faith and for a good consideration. Furthermore, the legislature has indicated its interest in this area, by enactment of section 49 of the Illinois Chancery Act, regarding creditors of remaindermen, Ill Rev Stats 1965, chap 22, Par 49, and yet has not sought to invalidate all assignments of remainder interests. If such interests are to be made inalienable it is a matter either for the legislature, or for the testator in each instance by way of spendthrift provisions in the will.

 While Mary Isabelle advances the argument that the assignment of a future interest amounts, in equity, only to a contract to assign the interest when it becomes payable, and that an assignee seeking to enforce such a contract must come into equity with clean hands, she does not controvert the assignees' evidence that each transaction was entered in good faith, nor does she show in what manner the assignees have come into equity with unclean hands. On the contrary, it was Mary Isabelle who waited from six to fifteen years before she made known her intention to claim fraud and to attempt to defeat the contracts. By her own conduct she made it appear that she would not in any way interfere with or attempt to invalidate any of the assignments. During this period the value of the interests increased greatly, the conditions for distribution of the assets to Mary Isabelle set out in the Will had come about, and several of the parties to the assignments and those who had dealings with Mary Isabelle had died.

The other matters advanced by Mary Isabelle concerning her attempt to sustain the Master and the Chancellor have been considered and found to be without merit.

It is difficult to determine from the record which of the various assignments are as yet being contested. Consequently, this holding applies to those assignees and subassignees who have not as yet settled their claims with Mary Isabelle Llewellyn.

216

The assignees assail that part of the decree which authorizes the sale of the real estate by the Trustee, on the ground that the Llewellyn Will does not give the Trustee "any power whatsoever to sell the real estate after the termination of the Trust period for the purpose of making division and distribution thereof."

The portions of the Llewellyn Will which relate to the power of the Trustee regarding sale and distribution of the Estate assets are as follows:

"Second . . .

"(a) My Trustees shall enter into, take possession of, receive, hold, manage and collect the Trust Estate and all income therefrom. They may bargain, sell and convey at public or private sale any portion of the Trust Estate, whether real, personal or mixed, for such price, and upon such terms and to such persons as my Trustees shall deem advisable; they may improve, lease for ninety-nine years, or longer or shorter terms, or for terms in praesenti or in futuro, mortgage or otherwise encumber my real estate and personal property, and generally be vested with all such rights concerning the disposition, re-investment and management of my Estate which I could exercise if living, using their discretion in all matters not in conflict with law. My Trustees may in their discretion hold any investments made by me prior to my death, or may invest and re-invest the Trust Estate and the proceeds thereof in such other manner as they may deem in the best interests of my Estate, and in making any such investments my Trustees shall not be limited to investments of the character prescribed by the laws of the State of Illinois as investments that may be made with trust funds.

"Third. For the purpose of making division and distribution of the Trust Estate or any portion of the

217

Trust Estate created by this, my Last Will and Testament, I hereby authorize and empower my said Trustees to appraise the property which they hold in trust, and the value which they shall place upon the property for that purpose shall be binding and conclusive upon my heirs-at-law and all the beneficiaries under this will. Such division and distribution may be made in cash or in kind."

The assignees' argument is based upon the contention that under the cases in Illinois, once the trust has terminated, the trustee has no implied power to sell real estate in order to distribute it, unless such sale is absolutely necessary. They cite the cases of Moll v. Gardner, 214 Ill 248, 73 NE 442; Waterman v. Alden, 115 Ill 83, 3 NE 505; Friese v. Friese, 373 Ill 216, 25 NE2d 788; and Pool v. Rutherford, 336 Ill App 516, 84 NE2d 650. The Moll, Friese and Pool cases all involve situations where the trust had absolutely terminated and the trustee's rights and duties ceased thereunder except as to final distribution of the assets. Here, on the contrary, and contrary to the assignees' contention, the Trust is still active since Elizabeth Llewellyn Warner is still alive and was so at the time the sale was ordered. The Waterman case is clearly not applicable since the court there held that the sale of personalty was within the trial court's discretion and since the decision is based on grounds other than those raised here by the assignees.

The assignees also maintain since distribution was authorized to be made in kind, there was no evidence that it could not have been distributed in kind, and that the Chancellor made no finding that such a division was impossible or impractical, nor made any finding that such sale was necessary. They point to the fact that in 1956, seven years before the decree of sale in 1963, the Chancellor ordered that the real estate be held as an asset of the Trust Estate and further ordered that some 13% of the title thereof be held by the Trustee in a sep-

218

arate "Mary Isabelle Llewellyn-Paul P. Llewellyn Fund," and argue that such order shows division of the real estate could have been made in kind.

■ The portions of the Llewellyn Will which give the Trustee the power to deal in and with the Trust assets use the word "may" be made in cash or in kind rather than "shall" be made in cash or in kind, showing that the form of the distribution of the Trust assets was within the discretion of the Trustee. Furthermore the Trustee was given the power to generally deal in and with the Trust assets for the best interests of the Trust Estate.

Since the Trust is still active, part of the real estate will continue to be held by the Trustees as an asset. Evidence was offered by the Trustee subsequent to the 1956 order to hold the real estate, in support of its petition to sell, to the effect that the market value of the real estate was likely to decline within the next 2 or 3 years, and that the best and most productive use of the premises was as a home office of a large corporation, and not as a parking lot as the real estate was then being used. The assignees offered absolutely no evidence to contradict the evidence offered by the Trustee. The Chancellor found, and the 1963 decree recited, that from the evidence the value of the real estate was liable to fluctuation due to changes in economic and market conditions, that a good price could be obtained if sold within the near future, and that such sale was in the best interests of the Trust Estate at the minimum price set by the Chancellor in the decree.

■ It clearly does not appear that the Testator intended the Trustee to hold any property as a Trust asset which was liable to decline in value, and further did not intend that the Trustee divide and distribute a portion of an asset where such division would cause a reduction in the value of the portion of the asset being retained under the Trust. The Trust was still in force and effect

at the time the 1963 decree was entered. The Chancellor heard evidence concerning the desirability of the Trustee's holding or selling the real estate. We are of the opinion that the Chancellor did not abuse his discretion in finding that the Trustee had the power to sell the real estate under the Will, that an immediate sale was for the best interests of the Trust Estate, and in ordering the sale.

■■■ The assignees also assail the portion of the 1963 decree relating to the allowance of the Master's fees. It appears, and is in no way contradicted, that objections were filed to the allowance of the fees set by the Master, as well as a demand made for proof thereof. Furthermore, the record indicates that at the hearing before the Chancellor on the entry of the proposed final decree, it was understood between the court and the attorneys for the respective parties that the matter of proof on the fees would be held for a later date. An inspection of the Master's Certificate of Services shows that certain noncompensable items were charged for, such as docketing the case, obtaining files, and the like. Price v. Seator, 337 Ill App 248, 260, 85 NE2d 848. Also, no explanation is given for the request made by the Master for both statutory fees and his time charges, nor is there any hourly itemization given in connection therewith. See Jay-Bee Realty Corp., Inc. v. Agricultural Ins. Co., 320 Ill App 310, 331, 50 NE2d 973. A hearing as to these matters must be allowed.

■■■ The final point concerns what interest, if any, the minor child Charles Callison, also known as William M. Valentine, has in these proceedings. Since any interest which he may have is incidental to and stems solely from Mary Isabelle Llewellyn and since all the interest under the Llewellyn Will to which Mary Isabelle is entitled will now pass directly to her, Charles Callison has no interest in these proceedings.

For these reasons the decree is affirmed in part and reversed in part and the cause is remanded with directions to proceed in a manner not inconsistent with the views expressed.

Decree affirmed in part and reversed in part and remanded with directions.

BRYANT, P. J. and LYONS, J., concur.