2022 IL App (2d) 210774-U
No. 2-21-0774
Order filed September 1, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE CHICAGO TRUST COMPANY, N.A., as SUCCESSOR TRUSTEE of the SPYROS VLACHOS TRUST Dated July 11, 2005, as amended, | ) ) ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 18-CH-811 |
| KYRIAKI VLACHOS, JOANNE VLACHOS f/k/a Joanne Abboushi, ASHLEY ABBOUSHI, LINDSEY SAMIR ZOUMPOULIAS f/k/a Lindsey Abboushi, THE ORGANIZATION FOR THE INTERNATIONALIZATION OF THE LANGUAGE, THE GREEK STATE SCHOLARSHIP FOUNDATION, and THE CHARITABLE TRUSTS BUREAU OF THE ILLINOIS ATTORNEY GENERAL OFFICE, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| (The Greek State Scholarship Foundation, Defendant-Appellant; Kyriaki Vlachos, Ashley Abboushi, Lindsey Samir Zoumpoulias, Defendants-Appellees). | ) ) ) ) | Honorable Daniel L. Jasica, Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.

Justices Schostok and Bridges[1] concurred in the judgment.

## ORDER

¶ 1    *Held*:    The trial court did not err in granting summary judgment to deceased trust settlor's family members and denying summary judgment to purported beneficiary. The initial version of the trust contained blanks where any purported gift was to be specified. Another document purporting to be an amendment to the trust did not satisfy the trust's requirements for valid amendments. Affirmed.

¶ 2    This case arose when petitioner, The Chicago Trust Company, N.A., as successor trustee, petitioned for construction of the Spyros Vlachos Trust dated July 11, 2005, and amended thereafter. Chicago Trust asked the trial court to determine which of three competing versions of the trust agreement controlled the distribution of certain trust assets, specifically, the amount of any gift to respondent-appellant, The Greek State Scholarship Foundation (IKY).[2] IKY appeals from the trial court's ruling denying its cross-motion for summary judgment and granting respondents'-appellees', Kyriaki Vlachos's, Ashley Abboushi's, and Linday Samir Zoumpoulias's, cross-motion for summary judgment. We affirm.

¶ 3                                    I. BACKGROUND

---

[1]Justice Bridges participated in this appeal, but has since been assigned to the Fourth District Appellate Court. Our supreme court has held that the departure of a judge prior to the filing date will not affect the validity of a decision so long as the remaining two judges concur. *Proctor v. Upjohn Co.*, 175 Ill. 2d 394, 396 (1997).

[2]IKY is not a tax-exempt organization under United States tax laws. Further, at the hearing on the parties' cross-motions for summary judgment, Chicago Trust asserted that IKY is not a charitable organization and that its petition was previously amended to remove any description of IKY as a charitable organization.

¶ 4     Spyros, an attorney, resided in Athens, Greece. In 2004, he engaged Chicago attorney Mark Bischoff to draft a trust.[3] The document Bischoff prepared provided that, upon Spyros's death, three gifts would be distributed from the trust estate, specifically, to two foundations (one of which was IKY) and the remainder to his family (specifically, his wife and daughter). As Spyros had not yet finalized his plans for the gifts to the foundations, Bischoff left blank spaces in the draft trust document and instructed Spyros to fill them in and to execute the document and have it notarized.

¶ 5     In 2007, Spyros executed, in a separate instrument, an amendment to the trust, changing the gift in section 3.1 (not relevant to this appeal) from the American Hellenic Institute Foundation to the Organization for the Internationalization of the Greek Language (ODEG). In 2013, he executed, in a separate instrument, another amendment, specifying that the gift of the remainder to his family, which previously included his wife and daughter, now also included his two granddaughters (and with each party to receive equal shares of ¼ each of the balance of the trust estate).

¶ 6     Spyros died on May 16, 2016. He was survived by Kyriaki (his spouse), Joanne (his only child), and Ashley and Lindsey (his granddaughters).

¶ 7                          A. Chicago Trust's Petition

---

[3]Spyros acted as the initial trustee of the trust until his death, after which Joanne Vlachos and Comerica Bank & Trust, N.A., acted as co-trustees of the trust. On November 26, 2017, Comerica was removed as co-trustee and Chicago Trust was appointed as co-trustee of the trust. Chicago Trust accepted the appointment on December 19, 2017. On June 27, 2018, Joanne, as co-trustee, delegated to Chicago Trust sole authority to resolve any ambiguities in the trust.

¶ 8        In July 2018, Chicago Trust petitioned for construction of the trust. In its third amended petition filed in 2021, it asserted that, on or about July 11, 2005, Spyros executed the trust but that questions existed as to the condition of the trust at the time he executed it and whether it was amended.

¶ 9        Chicago Trust possessed three *photocopied* versions of the trust agreement, each consisting of *eight* pages: (1) the Blanks version; (2) the Figures version, which an attorney in Greece discovered after Spyros's death and that was ultimately forwarded to Chicago Trust; and (3) the Alternate Figures version that Kyriaki found with Spyros's personal papers about six years after his death and that contained alterations in two different colors of ink. All three versions contained the *same photocopied signature page*.[4]

¶ 10       Section 3 of the trust agreement addressed the distribution of the trust estate upon Spyros's death. Section 3.1 of the trust, as amended by the 2007 amendment, provided for a gift of 5% of the trust estate (not to exceed $50,000) to ODEG, which was established in Greece. The gift, Chicago Trust asserted, had been paid to and accepted by ODEG.

¶ 11       Section 3.2 of the trust differed in each version. However, the core language was identical and read as follows:

> "**Gift to State Scholarship Foundation.** _____(____%) of the trust estate to the Greek STATE SCHOLARSHIP FOUNDATION (hereinafter referred to as the 'I.K.Y.') located in Athens, Greece for the sole purpose of establishing a scholarship fund

---

[4]Initially, Chicago Trust possessed only the Figures version of the trust, and its petition asked the court to construe the ambiguity in the terms "700.000 (70%)" in section 3.2 of the Figures version.

titled 'Scholarship in memory of Nicholas and Georgia Vlachos' my parents. The proceeds (and/or capital) of that fund will be given exclusively to Greek graduates from any law school in Greece to assist them (one student per year), to take post-graduates [*sic*] studies in exclusively the following law schools at which I have studied, and have a high opinion of their academic standards, and believe that a study in either one of them will be exceptionally beneficial for the scholarship recipients, namely the University of Michigan Law School at Ann Arbor, Michigan, and the Northwestern University Law School in Chicago, Illinois, in that order; provided the recipient has been admitted to one of these schools."

¶ 12   Section 3.3, as amended by the 2013 amendment, provided a gift of the balance of the trust estate to Kyriaki, Joanne, Ashley, and Lindsey, in shares of equal value (*i.e.*, ¼ each).

¶ 13   Again, three versions existed of the trust. The Blanks version in the trustee's possession was a photocopy, and, in section 3.2, it contained the quoted passage above with the underlined section left blank. This is the version the family members assert is the valid and operative version.

¶ 14   The Figures version in the trustee's possession, which was discovered after Spyros's death, was also a photocopy. Chicago Trust asserted that, on July 29, 2021, it confirmed with counsel for Spyros's family, Graham Schmidt, that Schmidt possessed a version of the Figures document in which the handwritten portions of the instrument (other than the signature page, which was a photocopy) appear to have been made in original pencil lead. In section 3.2, the Figures version had "$700.000 (70%)" written in the underlined section. This is the version of the trust that IKY asserts controls.

¶ 15   The Alternate Figures version in the trustee's possession was a photocopy, and Schmidt confirmed to the trustee that he possessed a version of the document in which the handwritten

portions (other than the signature page, which, again, was a photocopy) appeared to have been made in original wet ink. In section 3.2, the Alternate Figures version has "70% or up to $700,000 (70%)" written in the underlined section. Also, in the margin, in original red ink, there is a reference to sections 3.1 and 3.3 of the trust having been repealed in 2007 and 2013. Finally, on the first page is a handwritten note in original red ink that reads "Original in safe deposit box #4 Bank of Piraeus." It also contains the word "copy" in the top left corner of the first page. No version of the trust was located in a safe deposit box in either Greece or the United States after Spyros's death.

¶ 16    Chicago Trust also alleged that Kyriaki had testified at her deposition that she recognized the Figures and Alternate Figures versions as containing Spyros's handwriting but did not know when he made the writings. Chicago Trust alleged that section 3.2 of the trust agreement gave rise to multiple ambiguities that prevented it from distributing the balance of the trust estate and required judicial construction. The value of the trust estate, it asserted, as of the date of Spyros's death, was $2,196,508.40, and 70% of that amount was $1,537,555.60. Chicago Trust also asserted that it was unclear if the date-of-death value or the date-of-distribution value was to be used in calculating any gift to IKY if the percentage of 70% was to be used to calculate the amount of its gift.

¶ 17    Chicago Trust also attached to its petition two trust amendments that Spyros executed. The first, dated May 27, 2007, and notarized, provided that, upon Spyros's death, the gift in section 3.1 to the American Hellenic Institute was rescinded and, instead, 5% of the trust estate (not to exceed $50,000) was to be gifted to ODEG, which was established in Athens, Greece. The second amendment, dated May 1, 2013, and notarized, repealed section 3.3 of the trust and substituted a

provision that gifted the balance of the estate upon Spyros's death to Kyriaki, Joanne, Ashley, and Lindsey, in equal shares of ¼ each.

¶ 18    Section 2.1 of the trust agreement provides that Spyros could "amend or revoke this instrument in whole or in part by instrument (other than my Will) signed by me, referring to this instrument, and delivered to the trustee during my life."

¶ 19    At his deposition, attorney Bischoff testified that, in 2004, Spyros contacted him to prepare a living trust. They met once in 2004 but otherwise communicated in writing. By February 18, 2005, Bischoff wrote to Spyros that they would "leave the issues as blank in the trust," which included how much would go to IKY. In March 2005, Bischoff mailed Spyros a draft agreement and noted that his firm had prepared the document even though Spyros still had to determine the percentages to distribute to IKY, his spouse and daughter, and another foundation. Thus, the firm "left blanks for [Spyros] to fill in." The process was "very fluid" for Spyros, and he made numerous changes to the trust. Bischoff tried to provide him flexibility. By May 2005, when he mailed Spyros another draft, Bischoff still did not know Spyros's intent concerning the gifts. He instructed Spyros that, after he filled in the percentages for the gifts to IKY and the other foundation, he execute the trust before a notary at the United States embassy.

¶ 20    In January 2017, Bischoff received from Joanne a complete stapled version of the Blanks version, along with the two amendments, a death certificate, and a UBS Financial Services, Inc., email. He did not believe that Spyros would have signed in front of a notary a trust document that was incomplete or blank. "Based on everything that I knew, and the detail of communication, it's hard for me to believe that he would have signed something that still had blanks. That was a really important piece to him, the charities."

¶ 21    Douglas Eaton, first vice president, wealth management, at UBS and Spyros's financial advisor, testified at his deposition that he started working with Spyros in the 1990s and continued to have him as a client through his death. On July 11, 2005, Spyros came to Eaton's office to have a trust document notarized. Diane E. Flores, an employee at UBS at the time, notarized the document. Eaton walked Spyros to Flores's desk but did not witness the signing or notarization. (Flores is believed to now be deceased.) Spyros took the document with him that day. Prior to this time, Spyros told Eaton that the purpose of the trust was to avoid probate and take care of his daughter Joanne. A brokerage account was opened for the trust. The application is dated August 18, 2005; it contains Eaton's signature on that date. A branch office manager's final approval signature is dated August 25, 2005. When clients open an account, Eaton explained, they fill out a form and UBS asks for a copy of the front and last pages of the trust. (The front page is for titling purposes, and the last page is to ensure the date is correct.)

¶ 22    Sometime in 2005, Eaton had a conversation with Spyros during which Spyros stated that he wanted to take care of his daughter and, during another conversation, about his granddaughters and daughter. The only copy that UBS had of the trust document contained blanks on the first two pages but an executed signature page.

¶ 23    Lindsey Abboushi, Spyros's granddaughter, testified that she learned of his trust after Spyros died. She was very close to Spyros. He paid her college tuition and was going to pay for her law school tuition but died the summer before Abboushi started law school. Spyros encouraged Abboushi to become an attorney and helped her select a law school. He made sure she was taken care of and paid the fee for her wisdom teeth removal, Greek school, etc. "[I]f we needed anything, he was there financially and emotionally." While he was alive, Spyros never said anything about wanting to make a gift to IKY.

¶ 24    Joanne, Spyros's daughter, testified that she never discussed the trust with Spyros before he signed it. She first saw a copy of the trust after Spyros's death.

¶ 25    Kyriaki, Spyros's wife, resides in Athens. She testified that she was married to Spyros for 35 years. She and Spyros did not have children together. Spyros kept copies of the trusts at his home in Athens. Kyriaki discovered them after his death and gave them to Joanne. Spyros wrote in pencil when he worked with drafts. For a final version of a document, he used a pen. "Spyros wanted to for certain help his family."

¶ 26                          B. Summary-Judgment Motions

¶ 27    On September 30, 2021, IKY moved for summary judgment, arguing that the Figures version of the trust was the controlling instrument and that it was entitled to 70% of the trust estate as of Spyros's death. Section 3.2 was never eliminated in any amendment, thus, it asserted, it was clear that IKY was to receive money. There was no evidence that the executed and notarized document, it maintained, was the same as the August 2005 document/Blanks version. Even if the Figures version was executed after 2005, IKY argued, it was a valid amendment because it is signed and notarized. The Alternate Figures version, it argued, contains red ink notations referencing the 2007 and 2013 amendments and, therefore, post-dates the amendments and could not have existed in 2005. Finally, IKY argued that the gift to it was a charitable gift that should be upheld.

¶ 28    Spyros's family members also moved for summary judgment, arguing that the Blanks version was executed in 2005, it was the operative agreement, and it showed that Spyros expressed no intent to make a gift to IKY.[5] The Blanks version, they asserted, was signed on July 11, 2005,

---

[5]Joanne did not join in the motion, but, in a separate filing (fashioned as a response to the

and was the only version of the trust someone (*i.e.*, UBS) received, in this case from Spyros, during Spyros's lifetime. The family members also argued that the Figures and Alternate Figures versions must have been created after the date that Spyros signed the Blanks version, because he had to have possessed a version of the trust where sections 3.1 and 3.2 were still blank, such as in the Blanks version. In other words, they asserted that the Blanks version must be the starting document for both subsequently discovered versions. All three versions, they noted, have the identical signature page, which is dated July 11, 2005. The family members also argued that the Figures and Alternate Figures versions were not valid amendments to the trust as a matter of law, because the handwritten markings in the documents are not accompanied by signatures or initialed and, thus, do not comply with the trust's mechanism for amendments.

¶ 29                          C. Trial Court's Ruling

¶ 30    On November 23, 2021, the trial court issued its memorandum opinion and order, granting summary judgment to Kyriaki, Ashley, and Lindsay[6] and denying IKY's summary-judgment motion. The court found that the Blanks version of the trust (which it referenced was the version Chicago Trust attached to its petition, *i.e.*, the eight-page document with blanks in sections 3.1 and

---

family members' motion), she asserted that she agreed with their position that no gift was due to IKY and that summary judgment in the family members' favor was appropriate. She also filed a response to IKY's motion, arguing that summary judgment in IKY's favor was not appropriate and that IKY was due no money. She is not a party to this appeal.

[6]The court noted that Joanne did not move for summary judgment but, by filing a response to the family members' motion and explicitly agreeing therein with their arguments and requesting that the court grant the family members' motion, effectively joined the family members' motion.

3.2) was the operative and controlling trust document. It noted that the limited known facts concerning the three competing versions of the trust agreement were largely undisputed. The court also noted that no one would be able to testify at a trial that they saw which version of the trust Spyros had in his possession and signed on July 11, 2005, at UBS. Also, Spyros took the document with him that day. In August 2005, he provided UBS with a photocopy of the July 11, 2005, signature page, along with the first two pages of the trust agreement with blanks in the fields in sections 3.1 and 3.2.

¶ 31    The trial court further noted that it was undisputed that the handwriting on the first two pages of the Figures version and the Alternate Figures versions of the trust agreement was Spyros's handwriting. There were no dates or initials next to the dollar amounts or percentages inserted into section 3.2 of the Figures or Alternate Figures versions. The margin notes in red ink concerning the "repeal" of sections 3.1 and 3.3 that appear in the Alternate Figures version, the court noted, "must have been added sometime *after* the date of the referenced 2007 and 2013 amendments." (Emphasis in original.)

¶ 32    The trial court noted that there is generally a presumption that blanks are filled in prior to execution of a trust document. See *Martin v. Martin*, 334 Ill. 115, 125-26 (1929) (interlineations, such as filling in of blanks that do not change the sense of the will, are deemed to have been written before the will was executed). However, it determined that the presumption was rebutted in this case. Referencing the partial copy of the trust provided to UBS in August 2005, the court determined that the only version of the trust agreement reasonably known to exist at any time prior to Spyros's death is the Blanks version, which supported a finding that, upon execution in July 2005, Spyros had not filled in the blank fields in section 3.2. The court noted that it made "little sense" that Spyros would have provided UBS with a document that was not the executed trust

agreement or provided a copy of the executed signature page and affixed to it two pages from an unexecuted draft of the trust.

¶ 33    The trial court also found that there was no way of determining when the Figures version was created or when the numbers included in the body of section 3.2 of the Alternate Figures version were added. "It could have been years later." Further, even if they were created at or near the time of the Blanks version, the court found, parol evidence could not be used to supply an essential term—the amount of the gift to IKY—of the trust agreement.

¶ 34    Finally, the court noted that the handwritten additions to the Figures and Alternate Figures versions could not be treated as proper amendments to the trust agreement, because the document requires that all amendments be signed by Spyros. In the two versions, there is no date, signature, initials, or notarization near the notes. In contrast, the 2007 and 2013 amendments, the court noted, were signed, dated, and notarized. "Spyros clearly understood how to formally amend the trust agreement when that was his intention." The pencil marking in the Figures version and the ink markings in the Alternate Figures version "reflect no such clear intent" and were not consistent with the formal amendment requirements. IKY appeals.

¶ 35                                    II. ANALYSIS

¶ 36    IKY argues that the trial court erred in granting the family members' summary judgment motion and denying its own motion. It contends that the factual record does not support voiding the gift to IKY and that, at the very least, the Figures version constitutes a valid amendment to the trust. For the following reasons, we reject IKY's arguments.

¶ 37    Summary judgment is proper only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West

2020). Since the parties filed cross-motions for summary judgment, they conceded that no material questions of fact existed and that only a question of law was involved that the court could decide based on the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. We review *de novo* the trial court's ruling on cross-motions for summary judgment. *Id.* ¶ 30. In addition, this case concerns the construction of a trust, which is a question of law we also review *de novo*. *Spencer v. Di Cola*, 2014 IL App (1st) 121585, ¶ 19.

¶ 38    "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). Summary judgment is appropriate in a case involving the construction of a trust, because the ascertainment of the trust's meaning or intent is strictly a matter of law. *BMO Harris Bank N.A. v. Towers*, 2015 IL App (1st) 133351, ¶ 27.

¶ 39    "The first purpose in construing a trust is to discover the settlor's intent from the trust as a whole, which the court will effectuate if it is not contrary to public policy." *Harris Trust & Savings Bank v. Donovan*, 145 Ill. 2d 166, 172 (1991). In construing trusts, courts apply the same rules of construction that apply in construing wills. *Id.* We give the words employed in a trust their plain and ordinary meaning. *Id.* Where trust language is ambiguous and the settlor's intent cannot be determined, we may rely on extrinsic evidence to aid construction. *McCarthy v. Taylor*, 2014 IL

App (1st) 132239, ¶ 58. Language is ambiguous when it is reasonably susceptible to more than one meaning. *Id.*

¶ 40                              A. Gift to IKY

¶ 41    IKY argues that this court should give effect to Spyros's intent in making a gift to IKY and that we should reverse the court's judgment and enter summary judgment in its favor, finding that Spyros gifted it in the Figures version 70% of the trust estate, or at the very least $700,000.

¶ 42    The family members respond that there is no ambiguous language to be construed, IKY's purported gift was initially blank, and section 3.2 was never validly amended. Thus, the purported bequest to IKY in section 3.2 of the trust fails for missing an essential term.

¶ 43    "The settlor's intent is determined as of the time the instrument is executed." *First National Bank of Chicago v. Canton Council of Campfire Girls, Inc.*, 85 Ill. 2d 507, 513 (1981). "Charitable gifts are viewed with peculiar favor by the courts, and every presumption consistent with the language contained in the instruments of gift will be employed in order to sustain them." *Village of Hinsdale v. Chicago City Missionary Society*, 375 Ill. 220, 231 (1940); see also *Stubblefield v. Peoples Bank of Bloomington*, 406 Ill. 374, 384 (1950) ("The law looks with favor upon charitable trusts, and the courts apply liberal rules of construction to sustain them"). However, "the court will generally prefer a construction of the will [that] most closely follows the statutes of descent." *Continental Illinois National Bank & Trust Co. of Chicago v. Llewellyn*, 67 Ill. App. 2d 171, 189 (1966); see also *Cahill v. Cahill*, 402 Ill. 416, 422 (1949) (there is a presumption in favor of the heir where there is an ambiguity in a will).

¶ 44    IKY argues that the trial court improperly inferred that, at the time Spyros executed and had notarized the trust on July 11, 2005, section 3.2 was left blank. It contends that the proper presumption was that, at the time he executed the document, the amount and percentage in section

3.2 in the Figures version was filled in. *Martin*, 334 Ill. at 125-26. IKY also argues that charitable gifts are favored by the courts. There is no question, it contends, that Spyros intended to gift IKY money, and he never amended the trust to delete section 3.2. The question is, in IKY's view, how much money IKY is to receive.

¶ 45    IKY references *Martin*, asserting that, when markings appear on a preprinted will or trust, a presumption arises that those marking were present when the testator executed the document. Further, citing *Smith v. Tri-R Vending*, 249 Ill. App. 3d 654, 661-62 (1993), it contends that only admissible evidence present in the record, not mere inferences drawn from other facts, can constitute a basis to rebut that presumption. The trial court, IKY asserts, erred in determining that the *Martin* presumption had been rebutted by an inference it drew, instead of relying on record evidence. Specifically, IKY argues that the Blanks version is irrelevant because (1) it is incomplete, and (2) the fact that Spyros sent UBS a partial version of the trust in August 2005 says nothing about which version he signed one month earlier. IKY maintains that what Spyros sent to UBS was not relevant and does not constitute "undisputed summary judgment evidence," as the court found, to rebut the presumption that Spyros signed the Figures version in July 2005. It also characterizes the court's finding as mere inference and guesswork. On the latter point, it contends that there are a number of possibilities as to why Spyros would have sent UBS a page with blanks in section 3.2, specifically, he may not have wanted UBS to learn the amount of the gifts he intended to make to the recipients or he could have made copies of the signature page and included those with the version of the trust stored on his computer that he printed at the time. There is nothing in the record, IKY urges, that gives any more credence to the court's version of the possible events than to any of the other possibilities, and there exist no facts that permitted the court to find the presumption rebutted that the Figures version was signed in July 2005. Its finding that there

is no way to know when the Figures version was created or when the numbers were added in section 3.2 was erroneous.

¶ 46    The family members respond that the trial court made reasonable inferences from the undisputed evidence and found the evidence rebutted the *Martin* presumption that the interlineations[7] of either the Figures or Alternate Figures versions existed as of the trust's execution.  The family members contend that the fact there are multiple conflicting versions of the same interlineations in section 3.2 raise suspicion that the changes were not made before execution.  Each of the three versions of the trust, they note, include an identical signature/notarization page reciting that Spyros signed the document on July 11, 2005.  The trust versions, the family members argue, cannot be placed in a timeline by physical examination of the condition of the signature/notarization page alone.  The trial court, they assert, correctly turned to the chain of custody.  The family members argue that neither the Figures nor the Alternate Figures versions have a chain of custody that begins while Spyros was alive, as does the Blanks version.

¶ 47    The family members take the position that the Blanks version was given to UBS in August 2005, about one month after Spyros signed it.  Bischoff testified that he advised Spyros to provide a copy to the financial institution in which he planned to deposit the trust funds.  In August 2005, in order to open a trust brokerage account, UBS required customers to provide either the first and last page of a trust instrument or the entire instrument.  The trial court found that Spyros gave UBS the Blanks version in August 2005 and that UBS maintained the Blanks version in its files from August 2005 to a time following Spyros's death.  The Blanks version's chain of custody, the family

---

[7]An interlineation is "[s]omething written between the lines of an earlier writing." INTERLINEATION, Black's Law Dictionary (11th ed. 2019).

members argue, is an important fact that rebuts the *Martin* presumption in favor of both the Figures and Alternate Figures versions. Turning to the Figures version, the family members contend that there was much less evidence showing that Spyros signed that version in July 2005: it has a signature/notarization page attached, and it was discovered after Spyros's death. They argue that the fact that the signature page was attached is not persuasive evidence that the Figures version was signed in July 2005 because the same copy was attached to the other versions of the trust.

¶ 48    We agree with the trial court's determination that any presumption that the Figures version was the version of the trust that Spyros executed was rebutted by the undisputed evidence concerning the documents that Spyros sent UBS in August 2005 that form the core of the Blanks version. Contrary to IKY's assertion, the trial court relied on evidence in the record, specifically the temporal proximity of Spyros's mailing in August 2005 of the portions of the Blanks version to UBS to open a brokerage account for the execution of the trust in July 2005, to draw the *only* reasonable inference that the Blanks version was the version of the trust that Spyros executed in July 2005. Although the UBS version was a partial version, the relevant pages are identical to the eight-page, *i.e.*, *complete*, Blanks version that Chicago Trust filed with its petition to construe the trust. The court did not err in determining that the Blanks version reflected Spyros's initial intent and that no factual questions existed to preclude such a determination. The trial court found, and it is undisputed, that no one will be able to testify at a trial that they saw which version of the trust Spyros had in his possession and signed on July 11, 2005, at UBS. Further, as the court noted, the Blanks version is the only version with a chain of custody that begins during Spyros's lifetime. IKY contends it is irrelevant where and when a document was ultimately found. However, this misses the mark. The fact that Spyros sent UBS the Blanks version (or at least the relevant pages of it) one month after executing his trust is strong evidence that the Blanks version is the version

that he executed and, therefore, rebuts any presumption that the blanks were filled in. Neither the Figures nor the Alternative Figures versions have such a link in time to the July 2005 execution date (other than the signature page, which is identical in all three versions). IKY's argument that there are several possibilities as to why Spyros would have sent a page with blanks in section 3.2, specifically, because he may not have wanted UBS to learn the amount any gifts he intended to make or he could have made copies of the blanks pages constitutes pure speculation by IKY. Nothing in the record suggests that Spyros either did not want his longtime financial advisor to learn of the amount of any gifts (the potential recipients of which were already identified on the document) or that, before he filled in the blanks, he photocopied[8] the first two pages of the blank document to submit to UBS (along with a copy of the executed signature page).

¶ 49    In *Smith*, upon which IKY relies, the court stated:

> "A presumption ceases to operate once there is enough evidence to support a finding of the nonexistence of the presumed fact. *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 462-63 (1983); *Barnes v. Brown*, 193 Ill. App. 3d 604, 611 (1990). There is no uniform test of how much evidence is necessary to rebut a presumption. *Dean*, 95 Ill. 2d at 463.

> An inference is a conclusion of fact that the jury may in its discretion draw from established facts. However, only under compelling factual circumstances must the fact

---

[8] Attorney Bischoff testified that he mailed drafts to Spyros. He did not state that he emailed them to his client. Thus, IKY's assertion that Spyros could have printed the trust version stored on his computer is not supported by the record.

finder draw a particular inference. M. Graham, Cleary & Graham's, Handbook of Illinois Evidence, § 302.2, at 83-86 (5th ed. 1990)." *Smith*, 249 Ill. App. 3d at 661.

¶ 50     IKY contends that mere inferences drawn from other facts cannot rebut a presumption. However, this was not the basis of the trial court's findings. A material factual issue precluding summary judgment exists where reasonable people might draw different inferences from the undisputed facts. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). Here, as we discussed above, the *only* reasonable inference, as the trial court found, was that Spyros signed the Blanks version of the trust. See *Waite v. Chicago Transit Authority*, 157 Ill. App. 3d 616, 619-20 (1987) (a fact may be inferred from circumstantial evidence only where the circumstances are such that the fact is the only inference that can be drawn and is not a product of speculation or conjecture). The trial court correctly rejected IKY's speculative and unsupported theories that Spyros either wanted to hide the gift amounts from his longtime financial advisor or that he photocopied a blank version of the document before giving it to UBS and then filled in the gift amounts on a different copy of the document.

¶ 51     We also reject IKY's argument that charitable gifts are favored and that this weighs in its favor. IKY is not a tax-exempt organization in this country and Chicago Trust removed from its petition any allegations that IKY is a charitable organization.

¶ 52     IKY also argues that the trial court's finding that Spyros would not have sent UBS a copy of the executed execution page but copies of unexecuted versions of the first two pages of the trust was unsupported by the evidence. It also contends that, to the extent that the court analyzed the trust in this context, it should have heard evidence on custom and practice regarding how testators provide redacted portions of trust agreements to financial institutions. We do not consider this

argument, as it appears to not have been raised below and is contrary to IKY's position that no factual questions preclude summary judgment in its favor.

¶ 53    IKY next argues that the fact that the gift in section 3.1 was actually paid out belies the trial court's logic. It contends that, if Spyros did not execute the Figures version in 2005, then the gift in section 3.1 should also be invalidated. However, it continues, if no gift was made in section 3.1 to begin with, there was nothing to amend despite the first amendment (executed in 2007), changing the gift recipient from the American Hellenic Institute Foundation to ODEG. We reject IKY's argument that the gift in section 3.1 should be invalidated. The issue was not before the trial court, and we decline to address it. In any event, we disagree with IKY that there was nothing to amend because there was no gift in section 3.1. The amendment changed the gift recipient. Even if there was no gift (because the section was left blank), an amendment would have been necessary to name a recipient.

¶ 54    In summary, the Blanks version of the trust is the operative version of trust.

¶ 55                    B. Whether Figures Version is a Valid Amendment

¶ 56    Next, IKY argues that, even if the Blanks version is the operative version of the trust, the Figures version's handwritten markings constitute a valid amendment to the trust. It contends that the trial court erred in finding that the Figures version could not constitute a valid amendment because the markings in section 3.2 are not accompanied by Spyros's signature, his initials, any date, or notarization in proximity to the interlineations. IKY contends that there is no such requirement and argues the trust agreement itself does not mandate that Spyros add such markings. IKY further suggests that the Figures version is a valid amendment because it contains Spyros's signature, it is dated, and it is notarized.

¶ 57    The family members respond that there is no indication on the Figures version when the handwritten markings were added to it.  The trial court, they note, stated that it had no way of knowing when the Figures version was created or when the numbers in section 3.2 of the Alternate Figures version were added.  The family members also note that there is no signature at the time of the handwritten markings in section 3.2 and that the signature/notarization page cannot be a signature for both the original trust instrument and its amendment or else the requirements for a signature for an amendment have no meaning.  Further, they note that section 2.1 of the trust provides that the trust must be amended by an instrument.  The plain meaning of this provision, they assert, is that it must be amended by a separate instrument from the trust instrument itself. Spyros, they argue, understood how to amend his trust by a separate instrument because he did so in executing the first and second amendments in 2007 and 2013, respectively.  If he had the intention to amend the instrument whenever the Figures version's marking were added, he could have created a similar formal amendment to what he had created in 2007 and 2013.  The family members point to the trial court's comment that the handwritten markings in the Figures version do not contain a date, initials, or notarization in proximity to the markings.  They do not meet section 2.1's requirements and, thus, the Figures version does not constitute a valid amendment.

¶ 58    We agree with the family members that the marking in the Figures version do not constitute valid amendments to Spyros's trust.  "If a method of exercising a power to modify is described in the trust instrument, the power can be asserted only in that manner." *Whittaker v. Stables*, 339 Ill. App. 3d 943, 946 (2003).  Section 2.1 of the trust provides the Spyros could "amend or revoke this instrument in whole or in part by instrument (other than my Will) signed by me, referring to this instrument, and delivered to the trustee during my life."  Thus, a valid amendment requires (1) an

instrument other than Spyros's will, (2) signed by Spyros, (3) referring to the trust, and (4) be delivered to the trustee during Spyros's life.

¶ 59    The Figures version does not meet all the requirements to constitute a valid amendment to Spyros's trust. It does not contain Spyros's signature. The signature/notarization page does not satisfy this requirement because it constitutes the execution page for the initial trust instrument. The Figures version also was not delivered to the trustee during Spyros's life. Rather, an attorney in Greece discovered the Figures version after Spyros's death and the document was ultimately forwarded to Chicago Trust. Further, there was no evidence that it was given to any prior trustee during Spyros's life. Although the notations in the Figures version may reflect that, sometime after 2005, Spyros was still considering making a gift to IKY, he did not follow section 2.1's requirements for a valid amendment to the trust.

¶ 60    In summary, the Figures version does not constitute a valid amendment of Spyros's trust.

¶ 61                                    III. CONCLUSION

¶ 62    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 63    Affirmed.